**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROY TAYLOR, a member of the PAWNEE NATION OF OKLAHOMA,<br><br>    *Plaintiff,*<br><br>    *v.*<br><br>KINGDOM OF SWEDEN, a foreign state,<br><br>and<br><br>THE NATIONAL MUSEUMS OF WORLD CULTURE, a government agency under the Swedish Ministry of Culture,<br><br>    *Defendants.* | Civil Action No.<br>1:18-CV-01133 (RJL) |

**REPLY MEMORANDUM OF KINGDOM OF SWEDEN**
**AND THE NATIONAL MUSEUMS OF WORLD CULTURE**
**IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

**WHITE & CASE**LLP

Claire A. DeLelle (D.C. Bar No. 974945)
Timothy L. Wilson, Jr. (D.C. Bar No. 1030145)
701 Thirteenth Street, N.W.
Washington, DC 20005
(202) 626-3600

Owen C. Pell (*pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200

*Counsel for Kingdom of Sweden and*
*The National Museums of World Culture*

March 28, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ........................................................................................................ 2

I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION UNDER THE
EXPROPRIATION EXCEPTION ....................................................................... 2

    A.    Settled D.C. Circuit Law Mandates That Sweden And The National
Museums Be Dismissed From This Action. ............................................. 2

    B.    The Opposition Concedes That The Amended Complaint Fails To Allege
A "Taking In Violation Of International Law" By Either Defendant. ...... 5

    C.    The Amended Complaint Fails To Establish Jurisdiction Because Taylor
Has Failed To Exhaust Available Remedies In Sweden For The Alleged
Taking. ..................................................................................................... 7

II.    IN ANY EVENT, THE NATIONAL MUSEUMS SHOULD BE DISMISSED
FOR LACK OF PERSONAL JURISDICTION .................................................. 8

III.    THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO
STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED ................... 12

    A.    All Claims Are Time-Barred As Of 1999 At The Latest. ...................... 12

    B.    Swedish Law Applies Because A True Conflict Exists Between The Laws
Of The Potentially Interested Jurisdictions ........................................... 14

IV.    THIS CASE SHOULD BE DISMISSED IN FAVOR OF PROCEEDINGS IN
THE MORE CONVENIENT AND APPROPRIATE FORUM OF SWEDEN ... 15

    A.    The FSIA's Venue Provision Does Not Require Deference To Taylor's
Choice Of Forum. ................................................................................... 15

    B.    Sweden's Courts Have Jurisdiction To Hear All Of Taylor's Claims And
To Enter And Execute Judgment Against Sweden And The National
Museums. ................................................................................................ 16

    C.    U.S. Courts Have Dismissed Cases Brought By U.S. Persons In Favor Of
Proceedings In Sweden. .......................................................................... 18

CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................5, 6

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 554 (2007)........................................................................................6

*\*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.,*
    137 S. Ct. 1312 (2017).................................................................................6, 7

*\*BPA Int'l, Inc. v. Sweden,*
    281 F. Supp. 2d 73 (D.D.C. 2003) ....................................................15, 16, 18, 19

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)........................................................................................9

*Cannon v. District of Columbia,*
    717 F.3d 200 (D.C. Cir. 2013)......................................................................13

*Croesus EMTR Master Fund L.P. v. Brazil,*
    212 F. Supp. 2d 30 (D.D.C. 2002).................................................................15

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014)........................................................................................9

*de Csepel v. Republic of Hungary,*
    169 F. Supp. 3d 143 (D.D.C. 2016)..............................................................5, 7

*\*de Csepel v. Republic of Hungary,*
    859 F.3d 1094 (D.C. Cir. 2017).....................................................................2, 3

*Fagan v Republic of Austria,*
    No. 08 Civ. 6715 (LTS) (JCF),
    2011 U.S. Dist. LEXIS 32058 (S.D.N.Y. Mar. 25, 2011) ...........................10

*First National City Bank v. Banco Para El Comercio Exterior de Cuba,*
    462 U.S. 611 (1983)........................................................................................9

*Garb v. Republic of Poland,*
    440 F.3d 579 (2d Cir. 2006)............................................................................5

*\*GSS Grp. Ltd. v. Nat'l Port Auth.,*
    680 F.3d 805 (D.C. Cir. 2012).........................................................................8

*Hardy Exploration & Prod. (India), Inc. v. Gov't of India,*
    219 F. Supp. 3d 50 (D.D.C. 2016) ........................................................................17

*Holey Soles Holdings, Ltd. v. Foam Creations, Inc.*,
    No. 05 Civ. 6939, 2006 U.S. Dist. LEXIS 25880 (S.D.N.Y. May 1, 2006) ...........................10

*Hunt v. DePuy Orthopaedics, Inc.*,
    636 F. Supp. 2d 23 (D.D.C. 2009) ........................................................................12

*In re Air Crash Over the S. Indian Ocean, on March 8, 2014,*
    Misc. No. 16-1184 (KBJ),
    2018 U.S. Dist. LEXIS 198598 (D.D.C. Nov. 21, 2018) ........................................15

*In re Papandreou*,
    139 F.3d 247 (D.C. Cir. 1998) ........................................................................15

*In re Vitamin Antitrust Litig.*,
    Misc. No. 99-197 (TFH),
    2001 U.S. Dist. LEXIS 25070 (D.D.C. Sept. 10, 2001) ........................................17

*Johnson v. McCool*,
    808 F. Supp. 2d 304 (D.D.C. 2011) ........................................................................12

*Kettey v. Saudi Ministry of Educ.*,
    53 F. Supp. 3d 40 (D.D.C. 2014) ........................................................................3

*Lockman Found. v. Evangelical Alliance Mission*,
    930 F.2d 764 (9th Cir. 1991) ........................................................................17, 18

*Malewicz v. City of Amsterdam*,
    362 F. Supp. 2d 298 (D.D.C. 2005) ........................................................................11

*Malewicz v. City of Amsterdam*,
    517 F. Supp. 2d 322 (D.D.C. 2007) ........................................................................11

*Marra v. Papandreou*,
    59 F. Supp. 2d 65 (D.D.C. 1999) ........................................................................17

*Mediterranean Golf, Inc. v. Hirsh*,
    783 F. Supp. 835 (D.N.J. 1991) ........................................................................18

*MMA Consultants 1, Inc. v. Republic of Peru*,
    719 F. App'x 47 (2d Cir. 2017) ........................................................................7

*Nieves v. American Airlines*,
    700 F. Supp. 769 (S.D.N.Y. 1988) ........................................................................16

*Nieves-Villanueva v. Soto-Rivera,*
   133 F.3d 92 (1st Cir. 1997)............................................................................17

*Online Payment Solutions Inc. v. Svenska Handelsbanken AB,*
   638 F. Supp. 2d 375 (S.D.N.Y. 2009)......................................................15, 18, 19

*Philipp v. Fed. Republic of Germany,*
   894 F.3d 406 (D.C. Cir. 2018).........................................................................2

*Practical Concepts, Inc. v. Republic of Bolivia,*
   811 F.2d 1543 (D.C. Cir. 1987).......................................................................4

*PT United Can Co. v. Crown Cork & Seal Co.,*
   138 F.3d 65 (2d Cir. 1998)............................................................................17

*Republic of Argentina v. Weltover, Inc.,*
   504 U.S. 607 (1992).....................................................................................4

*Republic of Austria v. Altmann,*
   541 U.S. 677 (2004).....................................................................................8

*Roeder v. Islamic Republic of Iran,*
   333 F.3d 228 (D.C. Cir. 2003).....................................................................3, 4

*\*Rukoro v. Fed. Republic of Germany,*
   No. 17-CV 62-LTS, 2019 U.S. Dist. LEXIS 36098 (S.D.N.Y. Mar. 6, 2019).........4

*Schubarth v. Fed. Republic of Germany,*
   220 F. Supp. 3d 111 (D.D.C 2016)................................................................11

*Schubarth v. Fed. Republic of Germany,*
   891 F.3d 392 (D.C. Cir. 2018)...................................................................2, 11

*Siderman de Blake v. Republic of Argentina,*
   965 F.3d 699 (9th Cir. 1992).......................................................................11

*Simon v. Republic of Hungary,*
   812 F.3d 127 (D.C. Cir. 2016)......................................................................7

*Smith v. Overseas Korean Cultural Heritage Foundation,*
   279 F. Supp. 3d 293 (D.D.C. 2018)...............................................................5

*Thomson Consumer Elecs., Inc. v. Innovatron, S.A.,*
   3 F. Supp. 2d 49 (D.D.C. 1998)...................................................................17

*\*Tolbert v. Nat'l Harmony Mem'l Park,*
   520 F. Supp. 2d 209 (D.D.C. 2007).........................................................12, 14

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
   30 F.3d 148 (D.C. Cir. 1994) ............................................................................ 3, 4

*TransAmerica Leasing, Inc. v. La Republica de Venezuela,*
   200 F.3d 843 (D.C. Cir. 2000) ............................................................................... 9

*Williams v. Romarm, S.A.,*
   756 F.3d 777 (D.C. Cir. 2014) ............................................................................. 10

*Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,*
   215 F.3d 247 (2d Cir. 2000) ................................................................................... 7

## STATE CASES

*In re Estate of Delaney,*
   819 A.2d 968 (D.C. 2003) ..................................................................................... 13

*Mullin v. Wash. Free Weekly, Inc.,*
   785 A.2d 296 (D.C. 2001) ..................................................................................... 12

## STATUTES AND RULES

28 U.S.C. § 1391 ..................................................................................................... 15

28 U.S.C. § 1603 ........................................................................................... 1, 3, 5, 8

28 U.S.C. § 1605 ................................................................................................... 7, 8

Fed. R. Evid. 902(6) ................................................................................................. 7

Fed. R. Evid. 901(b)(8) ............................................................................................ 7

## PRELIMINARY STATEMENT

Taylor's Opposition effectively concedes that the Amended Complaint does not (and cannot) establish jurisdiction over Sweden and The National Museums. Statement of Points and Authorities in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Opp.") 6, 17, 21 n.5, 22. On this basis alone, the Amended Complaint should be dismissed with prejudice.

The Opposition acknowledges that settled law in this Circuit requires dismissal of Sweden because the artifacts at issue are not present in the United States. *Id*. at 17. The Opposition also does not contest that The National Museums carries out diplomatic priorities set by Sweden (*id.* at 6), and since these core functions are governmental, The National Museums also qualifies as a foreign state under 28 U.S.C. § 1603(a) and must be dismissed for the same reason as Sweden. Trying to avoid this result, the Opposition argues that those core functions are commercial because any private party can operate a museum. *Id.* at 19-20. But this misses the point because the unrebutted facts establish that The National Museums does more than run a museum — it serves as Sweden's governmental mouthpiece on cultural matters.

In any event, even if The National Museums is an "agency or instrumentality" under § 1603(b), the Opposition concedes that The National Museums is a "separate legal entity" (*id.* at 21), thereby entitling it to the due process protection of the minimum-contacts test. The Amended Complaint cannot satisfy that test either, because The National Museums has directed no activities relating to this action at the United States, and the Opposition rebuts none of the controlling authority on this point. The final blow as to FSIA jurisdiction is that the Opposition cannot cure the Amended Complaint's failure to allege that Sweden or The National Museums "took" — let alone expropriated — the artifacts. And, Taylor has nowhere rebutted the evidence showing that the artifacts were donated to The National Museums by a private individual in 1875.

Although the Court need go no further, the Opposition also fails to show how the Amended

Complaint can state a claim.  At bottom, Taylor's allegations, taken as true, establish that (i) White

Fox's companions knew in 1875 that his body ended up in the hands of a private person who then

donated it; (ii) neither Sweden nor The National Museums ever took any actions in the United

States relating to this case; (iii) the Pawnee Nation — of which Taylor was an officer and is alleged

to be an important figure — discussed the artifacts with The National Museums in 1996, such that,

at the latest, the three-year statute of limitations ran from that time; and (iv) this case has only one

connection to the United States — Taylor — while Swedish law and Swedish facts are central to

this action.  Accordingly, whether for failure to state a claim or forum non conveniens — a doctrine

applied by courts in this Circuit to dismiss FSIA actions (including in favor of Sweden) — this

action should be dismissed with prejudice.

## ARGUMENT

## I.   THE COURT LACKS SUBJECT-MATTER JURISDICTION UNDER THE EXPROPRIATION EXCEPTION

### A.   Settled D.C. Circuit Law Mandates That Sweden And The National Museums Be Dismissed From This Action.

Taylor concedes that he has not and cannot allege "that the Property is in the United States."

Opp. 17.  Therefore, Sweden must be dismissed with prejudice.   Specifically, as Sweden has

shown, the D.C. Circuit repeatedly has held that "a foreign state itself does not lose immunity

under the expropriation exception unless the allegedly expropriated property is located in the

United States."   Statement of Points and Authorities of Kingdom of Sweden and The National

Museums in Support of their Motion to Dismiss the Amended Complaint ("Mem.") 9 (quoting

*Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 401 (D.C. Cir. 2018), and citing *de Csepel*

*v. Republic of Hungary*, 859 F.3d 1094, 1107 (D.C. Cir. 2017) and *Philipp v. Fed. Republic of*

*Germany*, 894 F.3d 406, 414 (D.C. Cir. 2018) (dismissing sovereign states where disputed property

was not in the United States)).   Contrary to Taylor's claims (Opp. 17, 21 n.5), the D.C. Circuit's

holding in *de Csepel* — as applied in *Schubarth* and *Philipp* — now is settled law because the Supreme Court has denied certiorari.  *See de Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017), *cert. denied*, 586 U.S. __, 139 S. Ct. 784 (Jan. 7, 2019) (No. 17-1165).  It also is settled law that dismissal must be with prejudice.  *See, e.g.*, *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 49, 55 (D.D.C. 2014).

As to the National Museums, the unrefuted facts from Ms. Follin's Declaration establish that The National Museums is part of Sweden and therefore must also be dismissed because the property is not in the United States.  *See* Mem. 10-12 (arguing that, under *Transaero*, The National Museums' "core functions" are governmental such that it is part of the foreign state under § 1603(a)); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994). Taylor concedes, on the one hand, that The National Museums is a foreign state under § 1603(a), while on the other hand arguing — albeit in conclusory terms — that The National Museums is an agency or instrumentality under § 1603(b).  *Compare* Opp. 22 ("Because National Museums is a foreign state as defined by § 1603(a) it has no due process rights . . . ."), *with* Opp. 6 ("National Museums is an agency or instrumentality of Sweden as that term is defined under 28 U.S.C. § 1603(b)").  Taylor cannot have it both ways.

Importantly, Taylor does not dispute that The National Museums carries out the types of "core functions" that make it part of the Swedish government in that it was "established to carry out *governmental priorities set by Sweden*" and "is *tasked with propagating Sweden's view of world culture* both domestically and abroad."  *Id*. at 6 (emphasis added).  As *Transaero* highlighted, this type of core function is inherently governmental.  Mem. 10 (citing *Transaero*, 30 F.3d at 153).  The diplomatic function carried out by The National Museums is no less a "governmental function" than the role served by a country's air force.  *Roeder v. Islamic Republic*

*of Iran*, 333 F.3d 228, 234-35 (D.C. Cir. 2003) (applying *Transaero* to hold that a ministry of foreign affairs is the foreign state itself).

Instead, Taylor argues that The National Museums must be an agency or instrumentality because "private actors could engage in" the type of activities performed by museums and Ms. Follin purportedly concedes that The National Museums is a "state agency." Opp. 19-20. Neither argument squares with settled law. Effectuating the cultural priorities of a foreign sovereign is not the sort of activity that any private actor can undertake because such acts bear a government imprimatur that makes them inherently "sovereign and diplomatic undertakings." *Rukoro v. Fed. Republic of Germany*, No. 17 CV 62-LTS, 2019 U.S. Dist. LEXIS 36098, at *25-26 (S.D.N.Y. Mar. 6, 2019) (holding that uses of government property "to support cultural exchange or arts programs . . . . appear to be sovereign and diplomatic undertakings aimed at promoting interest in German culture and thus are not the 'type of actions by which a private party engages in trade and commerce.'" (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992))). That The National Museums might engage in commerce to effectuate some of these core governmental functions, as Taylor asserts, cannot save the Amended Complaint. As shown by cases Taylor cites (Opp. 20), all foreign states engage in some commercial activity incidental to their governmental functions. *Compare Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1549 (D.C. Cir. 1987) (differentiating between the "essential" and "incidental" acts of foreign states to determine their governmental or commercial character), *with Transaero*, 30 F.3d at 150 (action based upon Bolivian Air Force entering into contracts for aviation parts). Taylor's reliance on *Smith* and *de Csepel* also does not change that conclusion. Opp. 20.

As Sweden has already explained, *Smith* involved a U.S.-based foundation owned by South Korea which undertook a construction project that damaged adjoining property. *See* Mem. 12

(citing *Smith v. Overseas Korean Cultural Heritage Foundation*, 279 F. Supp. 3d 293, 295 (D.D.C. 2018)).  The foundation's relevant act for the "core functions" analysis was "to build and operate a museum."  *Smith*, 279 F. Supp. 3d at 297.  The construction project was "not an act that only a sovereign power can do" and rendered the foundation an "agency or instrumentality" under 28 U.S.C. § 1603(b).  *Id.*  Even less relevant is *de Csepel*, where it was *admitted* that the Hungarian entity was an "agency or instrumentality" under § 1603(b) — a point very much in dispute here.  *See* Mem. 12 (discussing *de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 167 (D.D.C. 2016)).

Finally, Taylor cannot rely on Ms. Follin's use of the phrase "state agency."  Opp. 20 (citing Follin Decl. ¶ 3).  Labels do not determine an entity's status under the FSIA; its core functions do, and Ms. Follin's unrefuted description of The National Museums' governmental functions could not be clearer.  *See, e.g.*, *Garb v. Republic of Poland*, 440 F.3d 579, 597 n.22 (2d Cir. 2006) ("[T]he very purpose of the 'core functions' test is to look beyond mere labels to discern whether an entity is actually engaged in predominately governmental activity or whether its primary functions are instead commercial.").

### B.   The Opposition Concedes That The Amended Complaint Fails To Allege A "Taking In Violation Of International Law" By Either Defendant.

Taylor cannot use his Opposition to cure the Amended Complaint's failure to allege a "taking" by Sweden or The National Museums.  In particular, the Opposition argues that the Court should interpret the allegation that Sweden and The National Museums "obtained" the artifacts to mean that they took them from White Fox's companions in violation of international law.  Opp. 5, 7-8.  That is a remarkable semantic leap that fails Rule 8's plausibility standard because it does not permit the Court "to infer more than the mere possibility of misconduct" on the part of Sweden or The National Museums.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Alleging that a scientist

took White Fox's body, and that The National Museums possesses his property today, simply "has not nudged [Taylor's] claims" that Sweden or The National Museums was responsible for illegally *taking* his body and possessions "across the line from conceivable to plausible." *Id*. at 680 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).   At bottom, the Amended Complaint is agnostic as to how either Defendant came into possession of the artifacts and thus fails to overcome the FSIA immunity of both.  *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017) (complaint must plead facts establishing that property at issue was taken in violation of international law and that a "good argument to that effect is not sufficient").

Nor would a "Second" Amended Complaint cure this jurisdictional defect because Defendants have submitted unrefuted evidence that the property at issue was donated to Sweden and The National Museums by a private philanthropist.  *See* Mem. 8 (citing Follin Decl. ¶¶ 21-25 & Exs. A-C).  Citing paragraphs 43 and 44 of the Amended Complaint, Taylor argues that the gift receipt — dated in 1875 and not undated as Taylor asserts — is irrelevant because "Sweden was in possession of White Fox's body and possessions when he died."  Opp. 15.  But these Amended Complaint paragraphs allege nothing more than White Fox's passing at Sahlgrenska Hospital. Taylor's reliance on Amended Complaint paragraphs 3, 44, 47, 49, and 51 fares no better — they allege only that White Fox's body was "surreptitiously sent by train to the Karolinska Institute" where, according to paragraph 48, a Swedish professor "had laid claim to White Fox's remains." Opp. 16; Am. Compl. ¶¶ 48-49.  These allegations cannot establish that Defendants took White Fox's remains or property — much less that they did so in violation of international law.  Even crediting the Opposition's claim that von Düben was a "government agent," the Amended Complaint nowhere alleges facts showing that he was acting within the scope of any governmental

authority.  To the contrary, the claim that his acts were "surreptitious" suggests quite the opposite. Am. Compl. ¶ 49.

The only undisputed facts appear in Ms. Follin's Declaration and the evidence attached to the Declaration.  Although the Court need not resolve any perceived factual dispute to grant the Motion to Dismiss, it may certainly do so at this stage.  *See Helmerich*, 137 S. Ct. at 1324 (urging courts to resolve factual disputes in FSIA cases "as near to the outset of the case as is reasonably possible").  Taylor fails to respond to — and has thereby conceded — Sweden's argument that this Court can accept the gift receipt and historical news articles submitted by Ms. Follin as evidence of the truth of their contents.  Mem. 8-9 (citing *MMA Consultants 1, Inc. v. Republic of Peru,* 719 F. App'x 47, 50 (2d Cir. 2017); Fed. R. Evid. 902(6), 901(b)(8)).  Accepting the truth of the contents of those historical documents establishes that, far from taking White Fox's property in violation of international law, Sweden accepted that property from a private donor.  Absent a "taking," there is no subject-matter jurisdiction over either Defendant under § 1605(a)(3).  *See id*. (citing *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000) and *de Csepel*, 169 F. Supp. 3d at 165).

### C.    The Amended Complaint Fails To Establish Jurisdiction Because Taylor Has Failed To Exhaust Available Remedies In Sweden For The Alleged Taking.

Taylor's Opposition fails to grapple with the distinction between an expropriation that constituted genocide, which does not require exhaustion, and a standard expropriation involving the taking of property without just compensation, which *does* require exhaustion.  In the case of genocide, an expropriation occurs at the moment of the taking, but in a basic takings case, the expropriation occurs when the dispute mechanisms of the state decline just compensation.  *See* Mem. 18 (explaining the distinction recognized in *Simon v. Republic of Hungary*, 812 F.3d 127, 148 (D.C. Cir. 2016)).  Contrary to Taylor's suggestion (Opp. 22), Sweden also does not argue

that a prudential exhaustion requirement exists outside of the FSIA — an argument that *Simon* rejected.  Rather, Sweden argues, as *Simon* and *Altmann* posit, that exhaustion is subsumed by § 1605(a)(3)'s requirement that any taking must be "in violation of international law."  Mem. 19 ("A plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the 'expropriating state' may have trouble showing a 'tak[ing] in violation of international law.'") (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 714 (2004) (Breyer, J., concurring)).  As Taylor has failed to seek compensation in Sweden's courts, he cannot establish jurisdiction under the expropriation exception.

## II.  IN ANY EVENT, THE NATIONAL MUSEUMS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

Even if the Court were to find The National Museums to be an "agency or instrumentality," the FSIA requires more than service alone to establish personal jurisdiction (*see* Opp. 21).  Rather, Taylor would need to show that The National Museums had minimum contacts with the United States.  *See* Mem. 14-17.  The Opposition insists that no such requirement exists because The National Museums is indistinguishable from the "foreign state," and therefore is not a "person" under the Fifth Amendment entitled to due process protections.  Opp. 21-22.

The problem with Taylor's argument is that if the National Museums is an agency under § 1603(b), then it presumptively is a "separate juridical entity" — something Taylor concedes (Opp. 21) — and thus, under the law of this Circuit, is entitled to "all the due process protections available to private corporations."  *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 814-15 (D.C. Cir. 2012).  Notwithstanding his concession, Taylor contends that The National Museums cannot use the minimum-contacts defense because it is so "extensively controlled" by Sweden that a principal-agent relationship arises to defeat any entitlement to due process protections.  Opp. 21.  But this argument is not supported by the Amended Complaint.

Taylor cannot get around the presumed separateness of sovereign entities. *See TransAmerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847-48 (D.C. Cir. 2000) (the presumption of separateness can only be overcome by either a showing of extensive control (such as the state and the agency having commingled funds, unitary operations, and the same leadership) or that the presumption "would work fraud or injustice") (citing *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983)).   No facts are alleged in the Amended Complaint showing any of the *TransAmerica* factors, nor does anything in The National Museums' Declaration suggest that Sweden exercises the degree of control required to overcome the presumption of separateness.   Instead, contrary to the Opposition (at 21-22), the Declaration sets forth *distinct* governmental functions carried out by The National Museums under Swedish law.   *See* Follin Decl. ¶¶ 4-11.

The Amended Complaint also lays no foundation for satisfying the minimum contacts requirements of due process.   It is undisputed that The National Museums is not subject to the general jurisdiction of U.S. courts.   *See* Mem. 15 (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).   Taylor also fails to contend with the caselaw establishing that The National Museums is not subject to specific jurisdiction.   *See* Mem. 15-17 (citing cases).   The Amended Complaint's four allegations of commercial activity, taken as true, show neither that The National Museums "purposely directed" any activities at the United States nor that the claims in this action "arise out of or relate to" those alleged activities.   *Id*. (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

In arguing that The National Museums used internet-based advertisements "to solicit United States-based customers" (Opp. 19), Taylor fails to address the problem that nothing about the alleged advertisements on visitsweden.com or Facebook, Twitter, and TripAdvisor are specific

to the United States.  *See* Mem. 13-14.  The English-language page of visitsweden.com does not even mention the United States or provide the country-specific options available on other countries' tourism websites.  *Id*.  Moreover, courts recognize that Facebook, Twitter, and TripAdvisor target a "worldwide" audience.  *Id*. at 14 (citing cases).  This "broad desire to target" a market larger than the forum "will not suffice" to confer specific jurisdiction.  Mem. 15-16 (quoting *Williams v. Romarm, S.A.*, 756 F.3d 777, 785 (D.C. Cir. 2014)).  Nor does English-language marketing evidence an intent to target the United States any more than Spanish-language advertisements specifically target Spain.  *See* Mem. 15-16; *see also Fagan v Republic of Austria*, No. 08 Civ. 6715 (LTS) (JCF), 2011 U.S. Dist. LEXIS 32058, at *48 (S.D.N.Y. Mar. 25, 2011) (finding that although foreign entity "does have an English-language website, there is no indication that the website was directed to New York, or even to the United States"); *Holey Soles Holdings, Ltd. v. Foam Creations, Inc.*, No. 05 Civ. 6939, 2006 U.S. Dist. LEXIS 25880, at *4 (S.D.N.Y. May 1, 2006) ("[T]he fact that a foreign corporation has a website accessible to New York is insufficient to confer jurisdiction under [the state long-arm statute] unless that website is purposefully directed towards New York.") (internal quotation marks and citations omitted).  Similarly, Taylor also cannot argue that Sweden's use of Facebook, TripAdvisor, or Twitter "obviously required contracts with United States companies" (Opp. 19) because this type of speculative and conclusory assertion cannot carry Taylor's burden of making a *prima facie* showing of personal jurisdiction.  *See, e.g.*, *Fagan*, 2011 U.S. Dist. LEXIS 32058, at *49 (granting motion to dismiss in part because conclusory allegations regarding English-language websites were insufficient to establish personal jurisdiction).

The National Museums' alleged historical collaborations with U.S. museums or artists also do not show an intent to "purposely direct" its activities here or "avail [itself] of the benefits of

conducting business" in the United States.  Mem. 18-19.  The alleged collaborations were limited in time and ended years ago.  Follin Decl. ¶ 19.  Long-extinct commercial activity cannot serve as a basis for establishing personal jurisdiction in U.S. courts years later.  *See Schubarth*, 891 F.3d at 399 n.4 (this interpretation of the expropriation exception's commercial nexus requirements "is supported by the FSIA's plain text, which employs the present tense"); *Schubarth*, 220 F. Supp. 3d at 115 ("Courts assessing the FSIA's commercial activity requirement have looked for evidence of recent or ongoing transactions.").  Further weakening Taylor's position, the alleged contacts also are far more attenuated than those at issue in the cases upon which Taylor relies.  Opp. 18. *Schubarth* involved several decades of marketing efforts by the foreign state in the United States involving "$1.65 billion in U.S. sales."  891 F.3d at 399-400.  Plaintiffs in *Siderman* "put forward evidence" that the foreign state advertised "in the United States" and solicited U.S. tourists "through its U.S. agent."  *Siderman de Blake v. Republic of Argentina*, 965 F.3d 699, 709 (9th Cir. 1992).  *Malewicz* involved artwork present in the United States as part of an art exhibit loan where the foreign state sent employees to the United States as escorts for the artwork and received "a substantial sum" in consideration for loaning the property to a U.S. museum.  *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 303 (D.D.C. 2005); 517 F. Supp. 2d 322, 332 (D.D.C. 2007).

Finally, Taylor does not dispute that his alleged injuries do not "arise out of or relate to" The National Museums' purported commercial activities.  Mem. 17-18.  Instead, they arise from events that occurred in Sweden over 140 years ago regarding property that Taylor admits is in Sweden and alleges was kept out of sight until 1996.  *See* Am. Compl. ¶¶ 41-57.  Therefore, to the extent the minimum contacts test applies, The National Museums must be dismissed for lack of personal jurisdiction, with prejudice.

### III.    THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED

#### A.    All Claims Are Time-Barred As Of 1999 At The Latest.

Contrary to the Opposition (at 23), the facts giving rise to the statute of limitations defense "appear clearly on the face of the" Amended Complaint, which expressly establishes that Taylor knew or should have known of any wrongful possession in 1996 *at the very latest*.  *See id*. at 24 (citing *Johnson v. McCool*, 808 F. Supp. 2d 304, 308 (D.D.C. 2011) (limitations period for conversion accrued when previously lawful possession became unlawful); *Hunt v. DePuy Orthopaedics, Inc.*, 636 F. Supp. 2d 23, 28 (D.D.C. 2009) (demand unnecessary for replevin limitations period to run unless that demand renders a previously lawful possession unlawful)); Am. Compl. ¶ 57.

Specifically, Taylor was aware of this allegedly wrongful possession by 1996, when the Pawnee Nation initiated a more than two-decade period of discussions with Sweden and The National Museums for the return of White Fox's remains and the artifacts.  *See* Am. Compl. ¶¶ 57-59.  While the Opposition now attempts to downplay Taylor's position within the Pawnee Nation (Opp. 27-28), Taylor's self-proclaimed status as a "respected member of the Pawnee Nation" and "respected tribal elder" necessarily means that he should have been able to "readily determine" his injury.  Am. Compl. ¶¶ 6-7; Opp. 27; *Tolbert v. Nat'l Harmony Mem'l Park*, 520 F. Supp. 2d 209, 212 (D.D.C. 2007) (quoting *Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001)). Given Taylor's assertion of the immense cultural, familial, and personal importance of White Fox's possessions — and his right to possess these artifacts under tribal law — it is not plausible that the Pawnee Nation would conceal its negotiations regarding the fate of a revered ancestor from that individual's "eldest living descendant."  Am. Compl. ¶¶ 6, 18-20, 69, 71-73.

The Court also can take judicial notice that Taylor served as Treasurer of the Pawnee

Business Council, the "supreme governing body of the Pawnee Nation," at least as early as 2010. Official Publication of the Pawnee Nation, *Chaticks Si Chaticks*, June 2010, at 2, https://www.pawneenation.org/files/PDFS/2010-06%20FINAL%20JUNE%202010%20for% 20Web.pdf (last visited Mar. 28, 2019); Government, Pawnee Nation of Oklahoma, https://www.pawneenation.org/page/home/government (last visited Mar. 28, 2019); *e.g.*, *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on local government agency website).   Taylor's alleged ignorance of The National Museums' possession of the artifacts thus cannot be credited, nor his allegation that the knowledge he did possess was limited to The National Museums' "nominally lawful" possession.  Am. Compl. ¶ 62; *see In re Estate of Delaney*, 819 A.2d 968, 982 (D.C. 2003) (inquiry notice rule focuses "on when the plaintiff gained *general* knowledge that she had been injured, not on when she learned of the *precise* legal remedies for her injury") (internal quotation marks and citations omitted). Similarly, Taylor's argument (Opp. 24) that the limitations period did not begin running until his counsel wrote a 2018 demand letter to The National Museums (*see* Am. Compl. Ex. J) ignores the fact that the demand letter also was written on behalf of the Pawnee Nation of which Taylor was an officer and which had been pursuing this matter since 1996.

But Taylor's own admissions establish that his claims expired even earlier.  According to Taylor, White Fox's companions requested that the artifacts at issue be buried along with his remains. Am. Compl. ¶¶ 44, 46.  Ten days after White Fox died in 1875, the Amended Complaint places his companions in Sweden, where there was a disagreement between them and the "medico-scientific authorities" over White Fox's body.  *Id*. ¶ 44.  Despite the Opposition's assertion that this dispute did not inform the companions of the alleged taking (*see* Opp. 26), Taylor concedes that the disposition of White Fox's body was both public and widely publicized.  Am. Compl.

¶¶ 48-52. Twelve days after the dispute over White Fox's remains, and only twenty-two days after his death, the donation of his alleged possessions also was published in newspapers. *See* Follin Decl. Ex. C (announcing that the "clothing of White Fox . . . has been purchased by the wholesaler J.J. Dickson and donated by him to the Gothenburg Museum").

While the Opposition (at 26) points out that the articles were not in English, one of those articles refers to White Fox by his Pawnee name, "Kee-wuch-oo-ta-kaa." *Id.*; *see also* Am. Compl. at 1 (White Fox was known as "Kee-Wuck-Oo-Tah-Kah"). This one-month chain of events, during at least some of which White Fox's Pawnee companions were in Sweden, sufficed to make the fact of the alleged injury to White Fox's relatives — the taking of his remains and possessions — able to be "readily determined." *Tolbert*, 520 F. Supp. 2d at 212. Moreover, the allegation that a Swedish scientist placed White Fox's remains on public display for an extended period of time in 1878 or 1879 also renders the alleged injury "readily determinable." *See* Am. Compl. ¶¶ 48-52. Thus, the three state-law claims accrued between 1875 and 1879 — "the time the injury actually occur[red]." *Tolbert*, 520 F. Supp. 2d at 212.

## B.  Swedish Law Applies Because A True Conflict Exists Between The Laws Of The Potentially Interested Jurisdictions.

Taylor agrees that in the event of a conflict of laws, this Court must apply the law of the jurisdiction with the most significant relationship to this action. *See* Opp. 35. But the Opposition fails to work through the conflict-of-laws issue common to all three of Taylor's claims: the Swedish law of adverse possession. *See* Mem. 23-24 (citing Munukka Decl. ¶ 17). Under that law, title to property passes to the adverse possessor after ten years unless the claimant to such property asserts his claim within six months after he knew or should have known about the other's possession. *Id.* The Opposition does not contest that Sweden's adverse possession law applies and instead asserts that Taylor's duty to file a claim accrued only in 2018. *See* Opp. 36-37. But,

as shown above, given the Pawnee Nation's 1996 negotiations with The National Museums, adverse possession of the property at issue occurred, at the very latest, in 2006, ten years after those negotiations. *See* Section III.A., *supra*. In any event, given the facts relating to White Fox's death in 1875, discussed above, title undoubtedly vested in The National Museums well over one hundred years earlier, in 1885.

## IV.   THIS CASE SHOULD BE DISMISSED IN FAVOR OF PROCEEDINGS IN THE MORE CONVENIENT AND APPROPRIATE FORUM OF SWEDEN

### A.   The FSIA's Venue Provision Does Not Require Deference To Taylor's Choice Of Forum.

Taylor's decision to file in the United States, rather than Sweden, is not owed any deference simply because the FSIA places venue in this District when no other district has a substantial connection to the action. *See* Opp. 29 (citing 28 U.S.C. §1391(f)(4)). The FSIA nowhere creates a presumption that actions against foreign sovereigns belong in the United States. To the contrary, this Circuit recognizes that forum non conveniens applies to actions covered by the FSIA. *See, e.g.*, *In re Papandreou*, 139 F.3d 247, 255-56 (D.C. Cir. 1998) (stating that it is "proper" to dismiss FSIA cases on forum non conveniens grounds). Indeed, this Court has dismissed FSIA cases on forum non conveniens grounds, including in favor of Sweden's courts. *See, e.g.*, *BPA Int'l, Inc. v. Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003); *In re Air Crash Over the S. Indian Ocean, on March 8, 2014*, Misc. No. 16-1184 (KBJ), 2018 U.S. Dist. LEXIS 198598, at *98-99 (D.D.C. Nov. 21, 2018); *Croesus EMTR Master Fund L.P. v. Brazil*, 212 F. Supp. 2d 30, 41-42 (D.D.C. 2002).

Taylor not only offers no authority to the contrary, but agrees that his choice of forum may be overcome "where the public and private factors clearly point to a foreign forum." Opp. 29. This is particularly true here, where there is no link to the District of Columbia, but a strong link to Sweden. *See Online Payment Solutions Inc. v. Svenska Handelsbanken AB*, 638 F. Supp. 2d 375, 382 (S.D.N.Y. 2009) ("Plaintiff's choice of forum deserves less than substantial deference

because the allegations giving rise to this lawsuit focus on activity that occurred in Sweden and England."); *Nieves v. American Airlines*, 700 F. Supp. 769, 772 (S.D.N.Y. 1988) ("Although the plaintiff's choice of forum is entitled to some weight, it is given reduced emphasis where, as here, the operative facts upon which the litigation is brought bear little material connection to the chosen forum.") (citations omitted).

The only contacts Taylor identifies with this forum are (i) the presence of Sweden's Embassy and Ambassador here — neither of which relate in any way to this dispute; (ii) The National Museums' alleged transacting business here — which allegations cannot surmount the unrefuted facts from Ms. Follin; and (iii) Defendants' retention of counsel here — a fact that plays no role in the forum non conveniens analysis.  *See* Mem. 29 (citing cases); *see also BPA Int'l Inc.*, 281 F. Supp. 2d at 86 (treating the presence of Sweden's embassy in the District of Columbia as irrelevant).  Finally, the need to apply Swedish law in a case against a foreign state does not, as Taylor contends, implicate this "Circuit's interest in addressing issues of international dispute." Opp. 34.  It instead supports dismissal.  Mem. 29-30 (citing cases establishing that the need to apply foreign law, especially civil law, weighs heavily in favor of dismissal).

### B. Sweden's Courts Have Jurisdiction To Hear All Of Taylor's Claims And To Enter And Execute Judgment Against Sweden And The National Museums.

The Opposition does not offer any evidence or other facts to rebut Professor Munukka's expert opinion demonstrating that Sweden's courts can hear Taylor's claims, grant him compulsory process to compel witnesses and documents, and enter and execute judgment against Sweden and The National Museums.  *See* Mem. 27 (citing Munukka Decl. ¶¶ 19-24).  Instead, the Opposition takes issue with Professor Munukka's omission of citations to Swedish legal authority in his opinion, his supposedly "conclusory" statements regarding Swedish law, and the fact that Sweden does not offer a discovery regime as liberal as that of the United States.  Opp. 31.  The

Opposition also rejects the assertion that a ruling from this Court might not be automatically enforced in Sweden.  *Id*. at 33.

First, Professor Munukka's legal opinion serves as authority upon which this Court may rely.  *See, e.g.*, *Hardy Exploration & Prod. (India), Inc. v. Gov't of India*, 219 F. Supp. 3d 50, 59 (D.D.C. 2016) ("Both declarations [by Indian contract law experts] may . . . assist the Court in understanding the content of Indian law."); *In re Vitamin Antitrust Litig.*, Misc. No. 99-197 (TFH), 2001 U.S. Dist. LEXIS 25070, at *50, 55 (D.D.C. Sept. 10, 2001) (placing "primary reliance" on the declaration of French and German law experts); *Thomson Consumer Elecs., Inc. v. Innovatron, S.A.*, 3 F. Supp. 2d 49, 52 (D.D.C. 1998) ("One well-recognized exception to the bar on expert testimony for questions of law is for questions of foreign law.") (citing *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997)).  Professor Munukka is a professor of law at Stockholm University specializing in, among other areas, general contract law, sale of goods, principal-agent relations, unjustified enrichment, and property law.  Munukka Decl. ¶ 2.  His statements of the Swedish law applicable to this case are also detailed, providing the elements for each claim as well as other relevant legal provisions.  *See, e.g.*, *id*. ¶¶ 4-7 (explaining the law of "vindication," which is akin to replevin under Swedish law, and the applicability of Swedish inheritance and adverse possession laws).

Second, the fact that the discovery regime here might be more generous than that of Sweden — something that Taylor has not corroborated — cannot undermine Sweden's adequacy as an alternative forum.  *See, e.g.*, *Marra v. Papandreou*, 59 F. Supp. 2d 65, 74 (D.D.C. 1999) (Greece was an adequate forum "even if its discovery rules are substantially more restrictive than ours"); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 75 (2d Cir. 1998) (same for Indonesia); *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir. 1991)

(same for Japan); *Mediterranean Golf, Inc. v. Hirsh*, 783 F. Supp. 835, 848 (D.N.J. 1991) (same for France).

### C.   U.S. Courts Have Dismissed Cases Brought By U.S. Persons In Favor Of Proceedings In Sweden.

The Opposition discounts the immense burden of litigating this case in the United States. Sweden and The National Museums appreciate that it might be more comfortable for Taylor to proceed in the United States (*see* Opp. 32), but ease in and of itself is not the test for forum non conveniens.   Moreover, Taylor's in-person participation in the proceedings in Sweden seems highly unlikely and, if needed, could surely be accommodated by other means.   Instead, what tips the balance is, as Taylor admits, "the relative ease of access to proof, the availability of compulsory process, the cost of obtaining attendance of witnesses, and all other practical problems that make trial of a case, easy, expeditious, and inexpensive." *Id.* at 31-32.

Sweden is the more practical forum by any of these measures.   Taylor offers no reason that any of his family members would need to travel to Sweden to testify, but Sweden and The National Museums almost certainly would have to send fact witnesses to testify in any U.S. proceeding. *See* Opp. 32; Mem. 28.   Taylor also does not allege that any documents necessary to his claims would require translation into Swedish, while by his own admission nearly half of the exhibits attached to the Amended Complaint required translation into English.   *See* Opp. 33.   While the Opposition minimizes this burden, Sweden and The National Museums already have undergone the expense of translating Swedish-language information into English — including newspaper articles, gift registry files, and other documents — and will certainly face greatly increased costs if this action proceeds here.   *See* Mem. 33; *see also Online Payment Solutions Inc.*, 638 F. Supp. 2d at 380, 386-88 (S.D.N.Y. 2009) (dismissing in part because of the significant costs of translating relevant documents from Swedish to English, the challenges of accessing the evidence and

witnesses in Sweden, and the cost of having witnesses travel to the United States); *BPA Int'l, Inc.*, 281 F. Supp. 2d at 86 (same).

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in the Statement of Points and Authorities in Support of the Motion to Dismiss, The Kingdom of Sweden and The National Museums respectfully request that the Court grant their Motion to Dismiss the Amended Complaint in its entirety and with prejudice.

March 28, 2019

Respectfully submitted,

**WHITE & CASE** LLP

_____
Claire A. DeLelle (D.C. Bar No. 974945)
Timothy L. Wilson, Jr. (D.C. Bar No. 1030145)
701 Thirteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile:  (202) 639-9355
claire.delelle@whitecase.com
timothy.wilson@whitecase.com

Owen C. Pell (*pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
opell@whitecase.com

*Counsel for Kingdom of Sweden and
The National Museums of World Culture*