UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROY TAYLOR, a member of the PAWNEE NATION OF OKLAHOMA )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>KINGDOM OF SWEDEN, a foreign state )<br>)<br>)<br>and )<br>)<br>THE NATIONAL MUSEUMS OF WORLD CULTURE, a government agency under the Swedish Ministry of Culture, )<br>)<br>)<br>)<br>)<br>Defendants. ) | Civil Case No. 18-1133 (RJL)<br><br>**FILED**<br>AUG - 2 2019<br>Clerk, U.S. District & Bankruptcy Courts for the District of Columbia |

## MEMORANDUM OPINION
(August __1st__, 2019) [Dkt. # 14]

Roy Taylor ("plaintiff") brought this tort action against the Kingdom of Sweden ("Sweden") and Sweden's National Museums of World Culture ("NMWC") (collectively, "defendants") to recover personal property currently in defendants' possession. *See generally* Am. Compl. [Dkt. # 8]. Plaintiff is a member of the federally-recognized Pawnee Nation of Oklahoma tribe and the eldest living descendent of White Fox, a renowned Pawnee who traveled to Europe as a performer in 1874 and fell ill and died in Sweden a few months into his tour. *Id.* at ¶¶ 6, 33, 43. Plaintiff alleges that White Fox's mortal remains and personal belongings were taken by a Swedish scientist against the wishes of White Fox's brothers and travel companions. *Id.*

1

at ¶ 48. In 1996, Sweden returned some of White Fox's remains to the United States for burial in the Pawnee Nation. *Id.* at ¶ 57. Through this action, plaintiff seeks to recover White Fox's personal belongings and the rest of White Fox's remains, which plaintiff alleges were taken and are being held unlawfully by defendants. *Id.* at ¶¶ 75–89.

Pending before me is defendants' joint motion to dismiss plaintiff's Amended Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) as well as the doctrine of *forum non conveniens*. *See* [Dkt. # 14]. Upon consideration of the pleadings, the relevant law, and the entire record herein, and for the reasons stated below, defendants' motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction is **GRANTED**, and this case is **DISMISSED with prejudice**.[1]

## BACKGROUND

According to the Amended Complaint, White Fox was a revered member of the Pawnee Nation who served as a Pawnee Scout for the United States Army in the mid-to-late 1800s. Am. Compl. at ¶ 15. In 1874, White Fox traveled to Scandinavia to perform Native American dances, songs, and other customs for European audiences who, likely due to nineteenth-century American literature, were fascinated by native North Americans. *Id.* at ¶¶ 31–35. White Fox was accompanied on his European tour by his brothers, Red Fox and White Eagle. *Id.* From May 1874 to January 1875, the three

---

[1] As this case can and must be resolved on jurisdictional grounds, I need not consider defendants' alternative grounds for dismissal under Rule 12(b)(6) and the doctrine of *forum non conveniens*. *See, e.g., Africa Growth Corp. v. Republic of Angola*, Civ. No. 17-2469, 2019 WL 3253367, at *1 n.2 (D.D.C. July 19, 2019).

2

Pawnee men traveled to and performed in England, Denmark, Norway, and Sweden. *Id.* at ¶ 39.

Unfortunately, as the Pawnee brothers traveled across Europe, White Fox's health deteriorated. *Id.* at ¶ 40. Soon after arriving in Gothenburg, Sweden in January 1875, White Fox, who had been stricken with tuberculosis, succumbed to the illness and passed away. *Id.* at ¶ 43. Red Fox and White Eagle requested that White Fox receive a proper Pawnee burial, but a Swedish scientist allegedly ignored their instructions and claimed White Fox's body for scientific purposes; White Fox's remains and his Pawnee regalia were sent to Stockholm for analysis by an anatomy professor named Gustaf von Düben. *Id.* at ¶¶ 48–49.[2]

Plaintiff alleges that White Fox's remains were kept in storage and out of public view in Sweden for decades. *Id.* at ¶ 54. At some point, Sweden rediscovered the remains and in 1996 allegedly worked with the Pawnee Nation to return a portion of White Fox's remains to the United States for burial. *Id.* at ¶ 57. However, Sweden allegedly did not return White Fox's regalia and personal effects. *Id.* Plaintiff "believe[s]" that from 1996 to 2017, the Pawnee Nation made several repatriation requests to Sweden under the United Nations Educational, Scientific and Cultural Organization's ("UNESCO") 1970 Convention for the return of White Fox's belongings (although plaintiff claims he was unaware of those requests at the time). *Id.* at ¶¶ 55, 58. Sweden rejected the Pawnee Nations requests in early 2018. *Id.* at ¶ 59 & Ex. I.

---

[2] According to the Amended Complaint, White Fox's human remains were desecrated; von Düben allegedly flayed White Fox's body and attached his skin to plaster casts for display in Stockholm from 1878 to 1879. Am. Compl. at ¶¶ 51–52 & Ex. H.

3

According to the Amended Complaint, plaintiff is an Oklahoma resident, member of the Pawnee Nation, and White Fox's great-grandnephew and eldest living descendent. *Id.* at ¶ 6. Plaintiff claims that he "first learned about Defendants' possession of his ancestor's regalia and personal property in early 2018." *Id.* at ¶ 61. He alleges that defendants are in unlawful possession of White Fox's personal property, including but not limited to his war shirt, leggings, moccasins, earrings, and necklace, as well as the remainder of White Fox's body that Sweden did not return in 1996. *Id.* at ¶ 3 & Exs. A–F. Upon learning of defendants' possession of these items, plaintiff, through counsel, sent a letter containing his own repatriation request for the property, which he directed to Ann Follin, the Director General of Sweden's National Museums of World Culture ("NMWC"). *Id.* at ¶ 63 & Ex. J. According to the Amended Complaint, NMWC "is a government agency in Sweden under the Ministry of Culture" whose "mission is defined by ordinance which tasks [NMWC] with showcasing and bringing to life the cultures of the world." *Id.* at ¶ 9. NMWC rejected plaintiff's repatriation request in March 2018. *Id.* at ¶ 65 & Ex. K.

On May 14, 2018, plaintiff brought this action "for replevin and the repatriation and return of his ancestor's regalia and other personal belongings." *Id.* at 1. Specifically, plaintiff asserts claims against Sweden and NMWC for replevin, conversion, and unjust enrichment. *Id.* at ¶¶ 75–89. On December 21, 2018, defendants moved to dismiss the Amended Complaint with prejudice for lack of subject matter jurisdiction, failure to exhaust domestic remedies, lack of personal jurisdiction, failure to state a claim, and on *forum non conveniens* grounds. *See* Defs.' Mot. to Dismiss the Am. Compl. ("Defs.'

4

Mot. to Dismiss") [Dkt. # 14]. Plaintiff opposed the motion to dismiss on February 26, 2019, see Pl.'s Opp'n to Defs.' Mot. to Dismiss the Am. Compl. ("Pl.'s Opp'n") [Dkt. # 15], and defendants filed their reply on March 28, 2019, see Reply in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Defs.' Reply") [Dkt. # 16].

## **LEGAL STANDARD**

Defendants contend that the Foreign Sovereign Immunities Act ("FSIA" or "Act"), 28 U.S.C. §§ 1602 *et seq.*, provides them with immunity from plaintiff's suit and that no exception to the Act applies, thereby depriving this Court of subject matter jurisdiction over plaintiff's case. Defs.' Mot. to Dismiss at 5–18; *see Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000). As FSIA immunity is "an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits," a "district court must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible." *Id.* (internal quotation marks and citation omitted).

The FSIA "envisions a process for litigating against foreign powers that respects the independence and dignity of every foreign state as a matter of international law while providing a forum for legitimate grievances." *Murphy v. Islamic Republic of Iran*, 778 F.Supp.2d 70, 71 (D.D.C. 2011). Accordingly, "a foreign state is presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002). The FSIA codifies certain limited statutory exceptions to this presumptive immunity, and those exceptions constitute "the sole basis for obtaining jurisdiction over a

5

foreign state in the courts of this country." *Nelson*, 507 U.S. at 355 (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Specifically, under the Act courts lack subject matter jurisdiction over foreign states unless one of the exceptions in §§ 1605 or 1607 applies. *See* 28 U.S.C. §§ 1330(a), 1604.

A motion to dismiss based on FSIA immunity may challenge not only the legal sufficiency of a plaintiff's jurisdictional allegations, but also "the factual basis of the court's subject matter jurisdiction under the FSIA, that is, either contest a jurisdictional fact alleged by the plaintiff . . . or raise a mixed question of law and fact." *Phoenix Consulting, Inc.*, 216 F.3d at 149. As that is the case here, I am obligated to "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* "To the extent that jurisdiction depends on particular factual propositions (at least those independent of the merits), the plaintiff must, on a challenge by the defendant, present adequate supporting evidence." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008). Ultimately, though, "the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc.*, 216 F.3d at 40.

### DISCUSSION

In response to defendants' invocation of FSIA immunity, plaintiff relies exclusively on § 1605(a)(3), which contains the so-called "expropriation" exception to foreign state immunity. *See* Am. Compl. at ¶¶ 11–13. For that exception to apply, a plaintiff must allege facts showing that the:

6

rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

28 U.S.C. § 1605(a)(3).

As the expropriation exception illustrates, "[t]he FSIA carefully distinguishes foreign states from their agencies and instrumentalities." *De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1107 (D.C. Cir. 2017) (citing 28 U.S.C. §§ 1603(a)–(b), 1606, 1610). Section 1605(a)(3) treats the two categories of entity differently, providing distinct standards for satisfying the expropriation exception. For a "foreign state," immunity is lost "if the claim against it satisfies the exception by way of the first clause of the commercial-activity nexus requirement; by contrast, an agency or instrumentality loses its immunity if the claim against it satisfies the exception by way of the second clause." *Id.*; *see also id.* at 1107–08 ("the expropriation exception's two clauses make sense only if they establish alternative thresholds a plaintiff must meet depending on whether the plaintiff seeks to sue a foreign state or an agency or instrumentality of that state"). As "the distinction between" a "foreign state" and an "agency or instrumentality thereof" is "explicitly drawn" in § 1605(a)(3), the classifications are "relevant" here. *Jacobsen v. Oliver*, 451 F.Supp.2d 181, 195 (D.D.C. 2006). Accordingly, I will begin my analysis by determining the defendants' statuses under the FSIA.

Sweden is, of course, a foreign state. *See BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F.Supp.2d 73, 80–81 (D.D.C. 2003). To say the least, NMWC presents a more

difficult question. After careful review of the record and relevant precedent, however, I conclude that NMWC is "so closely bound up with the structure of the" Swedish sovereign that it is properly "considered as the 'foreign state' itself" under § 1605(a)(3). *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994); *Crist v. Republic of Turkey*, 107 F.3d 922, *2 (Table) (D.C. Cir. 1997) (holding that *Transaero* interpretation of "FSIA's general definition of 'agency or instrumentality' . . . applies to FSIA's expropriation exception").

Defendants have submitted persuasive (and undisputed) evidence demonstrating that NMWC's statutorily-defined core functions are an intrinsic part of Sweden's sovereign structure and governmental operation. Those functions include the promotion of Sweden's view of world culture to its own citizens and the international community as well as the country's ability to share that world view with people and institutions domestically and around the world. According to NMWC's Director General, the entity was created by Act of Swedish Parliament as "a state agency within the Swedish Ministry of Culture, which is itself a department of the Government of the Kingdom of Sweden." Decl. of Ann Follin [Dkt. # 14-2] at ¶¶ 3–4. Swedish law dictates and regulates "the mission, operations, and management of [NMWC]." *Id.* at ¶ 5. In addition, the Ministry of Culture obligates NMWC to "carry out certain governmental priorities set by" Sweden, *id.* at ¶ 7, including "establishing and fostering educational, informational, and cultural exchanges with foreign countries, universities, non-governmental organizations, and the public," *id.* at ¶ 8. NMWC must, on the Ministry of Culture's behalf and not for profit, *id.* at ¶ 9, maintain and develop its collections, make those collections available to

8

the public for educational purposes, cooperate with other national and international museums and civil society organizations, and promote knowledge sharing with educational institutions. *Id*. at ¶ 12. Relatedly, on these matters of cultural diplomacy NMWC speaks for Sweden to further the "educational role" of the country's "cultural patrimony on the international stage" and "propagate" its "view of world culture domestically and abroad." *Id*. at ¶¶ 9–10.

The record in this case establishes that NMWC's "core functions" are intertwined with Sweden's sovereign obligations such that NMWC is part of the foreign state. *See, e.g.*, *Transaero, Inc.*, 30 F.3d at 153. While a country's armed forces are perhaps the quintessential example of intrinsically sovereign entities, the principle stated in our Circuit's decision in *Transaero* has been applied beyond "foreign military force[s]" to include other "necessary concomitants of sovereignty." *Id.* (internal quotation marks omitted). In *Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003), for example, our Circuit Court held that Iran's "Ministry of Foreign Affairs must be treated as the state of Iran itself rather than as its agent." *Id.* at 234. In *Howe v. Embassy of Italy*, 68 F.Supp.3d 26 (D.D.C. 2014), and cases cited therein, other judges on this Court have applied *Transaero* to hold "uniformly that embassies are integral parts of a foreign state's political structure and therefore appropriately considered foreign states for FSIA purposes." *Id.* at 33 (internal quotation marks, citations, and alterations omitted).

Out-of-Circuit precedent offers even better support for *Transaero*'s application here. In *Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001), the Fifth Circuit addressed a similar question in the FSIA service-of-process context. Relying on our

Circuit's decision in *Transaero*, the *Magness* court reasoned that, on the one hand, Russia's State Diamond Fund—a state agency "created to house and oversee Russia's collection of precious stones," *id.* at 611 n.1—was a fundamentally commercial entity and therefore "an instrumentality of Russia," *id.* at 613 n.7. On the other hand, Russia's Ministry of Culture was "a political subdivision" of the Russian state, the "core functions" of which were governmental; the Ministry of Culture thus was part of the sovereign. *Id.*; *see Garb v. Republic of Poland*, 440 F.3d 579, 594–95 (2d Cir. 2006) (relying on *Transaero* and *Magness* in expropriation exception context to hold that Poland's Ministry of the Treasury was integral to Poland's conduct of its internal affairs and foreign policy and thus that its core functions were governmental, not commercial). The instant case fits comfortably within our and other Circuit precedent. NMWC is part of Sweden and subject to the "foreign state" standard set out in § 1605(a)(3). *See de Csepel*, 859 F.3d at 1107.[3]

Under § 1605(a)(3), foreign states do "not lose immunity under the expropriation exception unless the allegedly expropriated property is located in the United States."

---

[3] Indeed, plaintiff at least once appears to concede as much. *See* Pl.'s Opp'n at 22 ("Because [NMWC] is a foreign state as defined by § 1603(a) it has no due process rights . . ."). Moreover, the cases on which plaintiff relies for the proposition that "[c]ourts of this circuit have . . . held that a museum does not perform an inherently governmental function," *id.* at 20, are distinguishable on these facts. *See Smith v. Overseas Korean Cultural Heritage Found.*, 279 F.Supp.3d 293, 297 (D.D.C. 2018) (South Korean cultural foundation was an "agency or instrumentality" because its core function was "the establishment and operation of a cultural museum," which, "while rooted in policy interests promulgated by the government of South Korea, is an act in which both public and private entities may engage"); *de Csepel v. Republic of Hungary*, 169 F.Supp.3d 143, 167 (D.D.C. 2016) (holding that Hungarian museums were "agencies or instrumentalities" because defendants had admitted that fact in their answer and, in any event, the museums performed "largely commercial" functions).

*Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 401 (D.C. Cir. 2018) (citing *de Csepel*, 859 F.3d at 1107).[4] As such, plaintiff's admission that the property he seeks to recover through this lawsuit is located in Sweden, *see* Am. Compl. at ¶¶ 3–4[5]; Pl.'s Opp'n at 17 ("It is not alleged that the Property is in the United States."), resolves this case against him as to both defendants. *See Schubarth*, 891 F.3d at 401 (upholding dismissal of foreign state where there was "no dispute that the Estate or any property exchanged for it are located outside this country"); *Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 414 (D.C. Cir. 2018) (dismissing tort claims against foreign state where art collection at issue was in Berlin). Both Sweden and NMWC must therefore be dismissed with prejudice for lack of subject matter jurisdiction. *See, e.g.*, *Kettey v. Saudi Ministry of Educ.*, 53 F.Supp.3d 40, 49, 55 (D.D.C. 2014) ("because the Court . . . finds that Defendants are immune under the FSIA from suit on Plaintiff's breach of contract and quantum meruit claims, these claims must be DISMISSED WITH PREJUDICE").[6]

---

[4] This is settled law in our Circuit, as the Supreme Court has declined to review our Circuit Court's decision in *de Csepel*. *See* 859 F.3d 1094 (D.C. Cir. 2017), *cert. denied*, 586 U.S. ___, 139 S.Ct. 784 (Jan. 7, 2019) (No. 17-1165). *Cf.* Opp'n at 17 (arguing in a brief filed on February 26, 2019 that *de Csepel* "is on cert to the United States Supreme Court").

[5] In the Amended Complaint, plaintiff further acknowledges that the items were "sitting in Stockholm . . . in storage," Am. Compl. at ¶¶ 53–54, that they "were not returned . . . to the United States" from Sweden in 1996, *id.* at ¶ 57, and that NMWC refused to repatriate these items from Sweden, *id.* at ¶¶ 63–66 & Pl.'s Exs. J–K.

[6] The result is the same even if NMWC is Sweden's "agency or instrumentality" under the FSIA because plaintiff has not adequately alleged that NMWC is "engaged in commercial activity in the United States" as required under § 1605(a)(3)'s second clause. Plaintiff alleges that NMWC engages in commercial activity by advertising online in English through visitsweden.com, TripAdvisor, Facebook, and Twitter, *see* Am. Compl. at ¶ 13(A)–(B), but these actions do not "attempt to target the United States market

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for lack of subject matter jurisdiction is hereby **GRANTED** and plaintiff's claims are **DISMISSED with prejudice**. A separate order consistent with this decision accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge

---

specifically," *Schubarth v. Fed. Republic of Germany*, 220 F.Supp.3d 111, 115 (D.D.C. 2016), *rev'd in part on other grounds*, 891 F.3d 392 (D.C. Cir. 2018). Even weaker is plaintiff's allegation that NMWC's brochures advertise collaborations with museums in the United States, as plaintiff fails to allege that the brochures even reach, much less specifically target, the United States. *See* Am. Compl. at ¶ 13(D). And NMWC's alleged contracts with United States artists "to display their works," *id.* at ¶ 13(C)—specifically, two contracts under which artists sent their work to NMWC for a limited time before it was returned—while closer, also do not establish NMWC "*is engaged* in commercial activity in the United States" because the most recent of the two contracts expired in January 2015, *see* Follin Decl. at ¶ 19, over three years before plaintiff filed this action. *Cf. Agudas Chasidei of U.S. v. Russian Fed'n*, 729 F.Supp.2d 141, 147–48 (D.D.C. 2010) ("[A]s of the time that this suit was initially filed in November 2004, the [defendant agency or instrumentality] had entered into contracts with two American corporations for the reproduction and worldwide sale of [defendant's] materials, including sale in the United States."). In any case, even putting aside the question of sovereign immunity, the foregoing allegations are insufficient to support the exercise of personal jurisdiction over NMWC by a United States court.